UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TAMMY POWELL and BOBBY POWELL, Individually and as Court Appointed Guardian of his Wife, TAMMY POWELL,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED PARCEL SERVICE, INC.,<br><br>Defendant. | Case No. 1:08-cv-1621-TWP-TAB |

**ENTRY ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

This matter is before the Court on Defendant United Parcel Service, Inc.'s ("Defendant" or "UPS") Motion for Partial Summary Judgment. This case arises out of a tragic automobile accident, in which Plaintiff Tammy Powell[1] suffered catastrophic injuries when she rear-ended a UPS truck. In their complaint, Plaintiffs requested punitive damages. In response, UPS filed the present motion, arguing that punitive damages are inappropriate because this case involves nothing more than garden-variety negligence. For the reasons set forth below, UPS's Motion for Partial Summary Judgment [Dkt. 92] is **GRANTED**.

**I. LEGAL STANDARD**

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d

---

[1] Throughout this entry, Mrs. Powell and her husband Bobby Powell are referred to collectively as "Plaintiffs."

487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). Finally, "neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

## II. BACKGROUND

**A.     The Delivery Driver**

The accident at the center of this dispute occurred while the driver of a UPS delivery truck, Raymond Moon ("Moon"), was in the process of making a delivery. Moon has worked as a UPS delivery driver since 1984. During his roughly quarter-century-long tenure, he has been involved in two similar rear-end collisions. From these experiences, Moon learned the object lesson that "[i]t's best to get out of the flow of traffic." There is no evidence to suggest that injuries were suffered as a result of those prior accidents.

**B.	The Accident**

On September 16, 2008, Moon was making a series of deliveries. Specifically, Moon had just finished making a delivery to the Iron Hawg, a motorcycle shop located on the eastbound side of US Highway 40 in Greenfield, Indiana ("US 40"). His next delivery was scheduled for a private residence located on the westbound side of US 40 ("the Rainbolt residence"). To access the westbound side, Moon used a "cut through"[2] to make a leftward u-turn. Moon entered the cut through, looked right to check for approaching traffic, and determined that the coast was clear. Moon turned left into the passing lane (or left lane) of westbound US 40, put his right turn signal on, and then moved into the curb lane (or right lane) to access the Rainbolt residence.

Moon traveled a short distance on a virtually curve-free portion of westbound US 40 and stopped his truck just past the Rainbolt residence, preparing to back into their driveway. In doing so, he partially obstructed the flow of traffic in the curb lane. Moon testified that doing so was necessary because his entire truck would not fit on the shoulder of the road. The passing lane remained unobstructed. Before backing into the driveway, Moon checked his rearview mirror and noticed that vehicles were approaching. Moon believed the traffic was too close to back in safely, so he waited, assuming the traffic would pass him. Moon felt it was safer to let traffic pass than to try to back in and block both lanes of traffic. Moon did not pull forward and circle back to make the delivery because such a maneuver would hobble efficiency.

While waiting, Moon checked his mirror two more times. While most of the traffic was

---

[2]During his deposition, Moon defined the term *cut through* as "the places that you can go from one side to the other to allow people to get into their driveways."

moving over to the passing lane, one car did not do so. Moon quickly realized this car was getting ready to rear-end him. Realizing a collision was imminent, Moon attempted to put his truck into first gear to lessen the impact – "so that the person [in the car] doesn't get hurt." Mrs. Powell, however, was not so fortunate. Her 2003 Dodge Neon, traveling 60 miles per hour, smashed into the UPS truck. As a result, she suffered life-altering brain injuries, necessitating a stay in an assisted living facility and a lifetime of medical treatment. According to a police investigator, the primary cause of the accident was Moon's decision to stop the truck in a lane of travel, "which obstructed traffic for motorists like Tammy Powell."

**C.    Moon's Practices and UPS's Policies**

Moon testified that he customarily backed into residential driveways when making deliveries, unless the driveway was u-shaped or another exit would allow him to exit the driveway head first. Moon was familiar with the route he was traveling on the day of the accident. In fact, he had made previous deliveries to the Rainbolt residence, always backing in because "it seemed the safest way to get out of the traffic." Additionally, Moon mentioned that he had observed children playing in the area.

Moon's "backing-in" practices appear to align with general UPS policy. David Wayne Jones, Moon's supervisor, testified as follows:

> Q. Tell me how, prior to September 16th, 2008, you trained the UPS drivers that reported to you, like Ray Moon, to make package deliveries to private residences with driveways that were connected to U.S. 40.
>
> A. I would train them to make the decision. If they could not get turned around or any doubt of getting turned around, that they would back first enough to get off the highway and then walk the package out.

UPS's Regional Health and Safety Manager, Steven Ricci, echoed this protocol and explained its

rationale:

> The reason that we teach that the driver should not nose the vehicle in is that when the driver noses the vehicle in, the driver is not sure of the conditions behind the vehicle. That's why part of the method is that if you have to make the decision to back, that we want the driver to back first because they have cleared the area to back. When the driver noses in, the driver has no control over what's behind him, another vehicle that pulls in, a child on a bicycle, a group of children walking behind the car, et cetera. So the nose in is to prevent not being able to control what happens when the driver gets back to the vehicle.

Finally, according to the deposition testimony of Brian Galyean, a fellow UPS delivery driver, UPS has what Plaintiffs have dubbed a "go home early" rule. Plainly stated, if a driver completes all of his daily assignments, he can go home before his or her shift concludes. Significantly, Moon's testimony did not touch on this rule. Moon did, however, testify that his work shift varied, based on the number of assigned deliveries. Finally, Moon testified that prior to the accident, he was not in "any particular rush" but he was "trying to be efficient." Additional facts are added below as needed.

### III. DISCUSSION

**A.      Indiana Law on Punitive Damages**

Indiana's stance on punitive damages is relatively well-settled. Designed to punish and deter, punitive damages are leveled in addition to compensatory damages. *Westray v. Wright*, 834 N.E.2d 173, 179 (Ind. Ct. App. 2005). For this reason, "they are quasi-criminal in nature and require a different showing than that required for an award of compensatory damages." *Id*. (citation omitted).

Generally, punitive damages are only reserved for reprehensible conduct. More precisely, "[u]nder Indiana law, a plaintiff may recover punitive damages only if he can show by *clear and*

5

*convincing evidence* that the defendant engaged in *conscious and intentional misconduct* that he knew would *probably result in injury.*" *Purnick v. C.R. England, Inc*., 269 F.3d 851, 852 (7th Cir. 2001) (citations omitted; emphasis added); *Picadilly, Inc. v. Colvin*, 519 N.E.2d 1217, 1221 (Ind. 1998); *see also Austin v. Disney Tire Co., Inc.*, 815 F. Supp. 285, 288 (S.D. Ind. 1993) ("There must be sufficient direct or circumstantial evidence of the malfeasor's state of mind to conclude that the person recognized the danger and *consciously* disregarded it; mere failure to recognize a dangerous situation or non-iniquitously failing to exercise proper judgment in such a situation [is] not sufficient.").

Logically following, run-of-the-mill negligence does not support an award of punitive damages in actions arising in tort. *Wanke v. Lynn's Transp. Co.*, 836 F. Supp. 587, 599 (N.D. Ind. 1993). Rather, a plaintiff must show that the defendant "subjected [others] to probable injury, with an awareness of such impending danger and with heedless indifference of the consequences." *Bud Wolf Chevrolet, Inc. v. Robertson*, 519 N.E.2d 135, 136 (Ind. 1988). Significantly, Indiana law requires that punitive damages be supported by *clear and convincing* evidence (not just a preponderance of the evidence) of the defendant's state of mind. *Samuel v. Home Run, Inc.*, 784 F. Supp. 548, 550 (S.D. Ind. 1992) (citation omitted; emphasis added); *see also Westray*, 834 N.E.2d at 179 (clear and convincing evidence is "minutely below the 'reasonable doubt' standard"). This high hurdle was erected to prevent the imposition of punitive damages for conduct that is merely negligent. *Samuel*, 784 F. Supp. at 550-551 (citation omitted).

**B.  Application of Punitive Damages Law to the Evidence**

In response to the present motion, Plaintiffs forge two separate arguments why they are entitled to recover punitive damages – one relating to Moon individually, the other relating to

6

UPS's policies. Each argument is analyzed in turn below.

### 1. *Moon's Conduct and Mental State*

Plaintiffs argue that "Moon made a conscious and intentional decision to obstruct vehicular traffic, in violation of Indiana law, knowing that it probably would result in serious bodily injury to Powell." [Dkt. 112 at 13].[3] To bolster this argument, Plaintiffs make a two-pronged attack, emphasizing that: (1) Moon knowingly obstructed traffic, choosing to wait for cars to pass in lieu of driving forward and circling back; and (2) Moon knew that his conduct would *probably* result in serious bodily injury, primarily based on his two prior accidents that occurred under similar conditions. Moon's conduct, according to Plaintiffs, was far more egregious than a mere mistake or error in judgment.

While Plaintiffs' argument is well-taken, the Court respectfully disagrees. Even after taking all inferences in favor of Plaintiffs, the Court finds that it would be unreasonable to conclude that there is *clear and convincing* evidence that Moon acted with the requisite mental state to levy punitive damages. Indeed, Moon testified as to his efforts and intentions to proceed safely in making the particular delivery that precipitated the accident. Moreover, Moon testified that when the accident became imminent, he attempted to put his truck in gear to minimize the effect of the impact. With respect to Moon's two prior accidents – which occurred during the course of nearly a quarter-century-long career as a delivery driver – there is no evidence that they resulted in injury or that Moon was thinking about them on the day of the accident. At bottom, Plaintiffs did not produce evidence controverting Moon's testimony as to his state of mind.

---

[3]Ind. Code § 35-42-2-4 provides that a person "who recklessly, knowingly, or intentionally obstructs vehicular. . . traffic commits. . . a Class B misdemeanor."

The Court's decision is reinforced, and influenced, by a slew of factually analogous cases involving similar driving mishaps. Plainly stated, courts applying Indiana law have routinely held that lousy driving, without more, does not warrant punitive damages. *See, e.g., Purnick*, 269 F.3d 851, 852-54 (7th Cir. 2001) (affirming summary judgment ruling that motorist not entitled to seek punitive damages against trucker; evidence that driver falsified his logs to hide the amount he had driven over the week prior to the accident, was "mesmerized" by the road, failed to brake before impact, and could not recall when he first saw plaintiff's vehicle was insufficient to prove his mental state to sustain punitive damages because there was no proof he knew his actions would probably cause harm); *Austin*, 815 F. Supp. at 289-90 (partial summary judgment granted; holding that punitive damages could not be awarded against truck driver who was allegedly negligent in failing to stop for red light, sound his horn, or apply his brake as he entered intersection); *Samuel*, 784 F. Supp. at 552 (granting partial summary judgment; merely creating a dangerous situation as a driver does not support a further inference that the conduct was wanton or morally blameworthy so as to support punitive damages); *Westray* 834 N.E. 2d at 181 (although driver who looked away from road for five to ten seconds while approaching an intersection was "clearly negligent," punitive damages were improper). In some of these cases, the defendant's conduct appeared much more haphazard than Moon's. Overall, Plaintiffs' first argument is not supported by the evidence and contradicts applicable case law.

### 2. *UPS's "Go Home Early" Policy*

Next, Plaintiffs argue that UPS's "go home early" policy warrants punitive damages: "UPS's policy of encouraging a driver to determine how long or short his shift can be is in heedless disregard for the safety of other motorists." [Dkt. 112 at 13]. While Plaintiffs intimate

8

that this policy is thoroughly ingrained in UPS's mores, the actual evidence supporting the existence of such a policy is fairly scant. Specifically, it consists of the following portion of Brian Galyean's deposition testimony:

> Q. What happens if you have to deliver a certain number of packages, and you deliver them before your shift ends?
>
> A. You're done.
>
> Q. You get to go home, right?
>
> A. Yes.
>
> Q. You don't have to work the remaining part of the shift, correct?
>
> A. Yes.
>
> Q. Does that give you any incentive when you're making deliveries to get done quicker?
>
> A. No.

Based on this testimony, Plaintiffs extrapolate that UPS's "go home early" policy incentivizes reckless and cavalier behavior because, invariably, drivers rush to complete their work. To buttress this argument, Plaintiffs rely exclusively on *Wauchop v. Domino's Pizza, Inc.*, 832 F. Supp. 1577, 1582 (N.D. Ind. 1993), where the district court denied defendant's motion for summary judgment as to punitive damages based on Domino's "30 minutes or less" guarantee.

While this argument is creative, it fares no better than Plaintiffs' first argument. As an initial matter, Plaintiffs' reliance on *Wauchop* is misguided for two reasons. Most notably, in *Wauchop*, the plaintiffs proffered an array of evidence about the danger of the 30-minute guarantee, including concerns expressed to Domino's from outsiders, the media, and insurance underwriters. *Id*. at 1580, 1583 ("the plaintiffs have presented, at a minimum, circumstantial

9

evidence that Domino's had knowledge from a number of sources concerning the hazards of the 30-minute guarantee."). Here, by contrast, Plaintiffs have failed to direct the Court to a modicum of evidence that UPS had knowledge concerning the hazards of its purported "go home early" policy.

Next, in terms of incentives, the "go home early" rule is profoundly different than a "30-minute guarantee." In practice, only the 30-minute guarantee necessarily erects perverse incentives. By way of example, myriad intervening, but predictable, factors can derail a pizza delivery – a train on the tracks; being forced to stop for gas; a wrong turn; or a cooking blunder. Domino's simply had to know that, under such circumstances, a delivery worker would be *forced to* behave recklessly to *comply with* the employer's policy. Conversely, a "go home early" rule – which applies to countless professions – does not necessarily encourage bad behavior. The employer is simply saying, "there is no sense in staying at work if there is nothing left to do." Under Plaintiffs' proposed reasoning, a hospital that allows a surgeon to leave when his or her scheduled procedures are completed would necessarily be subject to punitive damages if that surgeon is negligent in the operating room. Simply stated, Plaintiffs' proposed view on punitive damages is overly-expansive. Plaintiffs have failed to show that UPS implemented a "go home early" policy with knowledge that it would likely result in injuries. Equally important, the record is devoid of evidence that Moon was rushing to avail himself of the "go home early" rule.

## IV. CONCLUSION

Ultimately, a jury may very well determine that Moon breached his duties. If that occurs, compensatory damages will be awarded accordingly. However, for the reasons set forth above, punitive damages are not appropriate under the circumstances. UPS's Motion for Partial Summary Judgment (Dkt. No. 92) is **GRANTED**.

SO ORDERED: 03/04/2011

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Copies to:

**O. Daniel Ansa**
ANSA ASSUNCAO, LLP
daniel.ansa@ansalaw.com,jennifer.mayer@ansalaw.com

**Trevor J. Crossen**
WAGNER REESE & CROSSEN, LLP
tcrossen@injuryattorneys.com,kgoodwin@injuryattorneys.com

**Melissa Forcum Danielson**
KIGHTLINGER & GRAY
mdanielson@k-glaw.com,dtracy@k-glaw.com

**John P. Lock**
MORRISON ANSA HOLDEN ASSUNCAO & PROUGH, LLP
john.lock@ansalaw.com,april.warrender@ansalaw.com

**Jason Ruskin Reese**
WAGNER REESE & CROSSEN, LLP
jreese@injuryattorneys.com,lsalinas@injuryattorneys.com, ,jwiley@injuryattorneys.com

**Jennifer Wright Schick**
MORRISON ANSA HOLDEN ASSUNCAO & PROUGH, LLP
jennifer.schick@ansalaw.com

**Michael Wroblewski**
KIGHTLINGER & GRAY
mwroblewski@k-glaw.com,wroblewski1991@yahoo.com,moconnor@k-glaw.com

**D. Bryce Zoeller**
KIGHTLINGER & GRAY
bzoeller@k-glaw.com,kmaloian@k-glaw.com